## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**JOSEPH R. WILCOX ET AL.**                          CIVIL ACTION

**VERSUS**                                                  No. 12-2389

**MAX WELDERS, L.L.C. ET AL.**                          SECTION I

## ORDER AND REASONS

Before the Court are three motions for summary judgment.  Defendant, Max Welders, LLC ("Max Welders"), filed a motion for summary judgment as to the claims asserted by plaintiffs, Joseph R. Wilcox and Lisa Wilcox, under the Jones Act and general maritime law.[1] Max Welders filed a separate motion for summary judgment to dismiss the indemnity cross-claims filed by defendants/cross-claimants, Superior Energy Services, Inc. ("Superior") and Wild Well Control, Inc. ("Wild Well").[2]  Superior and Wild Well have filed a cross-motion for summary judgment on the indemnity issue.[3]

### Background

Plaintiff, Joseph R. Wilcox ("Wilcox"), alleges that on June 5, 2012, he suffered serious injuries while performing welding services on a fixed platform located at South Timbalier Block 63 on the Outer Continental Shelf in the Gulf of Mexico.[4]  The welding work was performed pursuant to a decommissioning contract between the owner of the platform, Energy Resource

---

[1] R. Doc. No. 55.

[2] R. Doc. No. 56.

[3] R. Doc. No. 57.

[4] Complaint, R. Doc. No. 1, at ¶ 15; Max Welders' Statement of Facts, R. Doc. No. 55-6, at ¶ 49; Plaintiff's Statement of Facts, R. Doc. No. 66-3, at ¶ D-49.

Technology GOM, Inc. ("ERT"), and Wild Well, which is a subsidiary of Superior.[5]   The contract called upon Wild Well to remove extremely large caissons, jacket structures, and pipes from the gulf floor at 16 different designated locations.[6]   Wild Well contracted with Max Welders, Wilcox's employer, to provide welders to assist with the demolition work.[7]   The work assignment required that Wilcox live aboard Wild Well's barge, the D/B SUPERIOR PERFORMANCE.[8]   Wilcox alleges that he was injured when undetected gasses exploded as he was welding inside a pipe on the platform.[9]

Wilcox filed this lawsuit seeking relief under the Jones Act and the general maritime law or, alternatively, under the Longshore Harbor Worker's Compensation Act ("LHWCA").[10]   Wilcox alleges that his injuries resulted from negligence on the part of Max Welders, Wild Well, and Superior, as well as the unseaworthiness of the SUPERIOR PERFORMANCE.[11]   Max

---

[5] Plaintiff's Statement of Facts, R. Doc. No. 66-3, at p. 9, ¶¶ 1-2; Max Welders' Statement of Facts, R. Doc. No. 56-15, at ¶ 6; R. Doc. No. 67-5, at ¶¶ 2, 4; Superior/Wild Well Statement of Facts, R. Doc. No. 57-5, at ¶¶ 2, 4; R. Doc. No. 64-11.

[6] Plaintiff's Statement of Facts, R. Doc. No. 66-3, at p. 9, ¶ 3; ERT Request for Quotation, R. Doc. No. 66-2; Dewolfe Deposition, R. Doc. No. 66-3, at p. 23.

[7] Max Welders' Statement of Facts, R. Doc. No. 55-6, at ¶ 3; R. Doc No. 65-15, at ¶ 15; Plaintiff's Statement of Facts, R. Doc. No. 66-3, at ¶ D-3; Superior/Wild Well Statement of Facts, R. Doc. No. 57-5, at ¶ 6; R. Doc. No. 64-11.  As discussed below, Max Welders and Wild Well dispute whether the work was performed pursuant to a Master Service Agreement and/or Vessel Boarding Agreement.

[8] As discussed below, the parties dispute the extent and nature of Wilcox's duties aboard the SUPERIOR PERFORMANCE and other vessels.  Max Welders' Statement of Facts, R. Doc. No. 55-6, at ¶ 50; Plaintiff's Statement of Facts, R. Doc. No. 66-3, at ¶ D-50.

[9] Complaint, R. Doc. No. 1, at ¶ 15.

[10] Complaint, R. Doc. No. 1; Second Amended Complaint, R. Doc. No. 30.

[11] Complaint, R. Doc. No. 1.  Plaintiff's wife, Lisa Wilcox, seeks damages for loss of support, loss of society, and loss of consortium.  *See id.*

Welders filed an answer generally denying responsibility for plaintiff's injuries and also challenging plaintiff's status as a Jones Act seaman.[12]  Wild Well and Superior similarly denied liability and they jointly filed a cross-claim against Max Welders alleging that Max Welders agreed to indemnify and hold harmless Superior and its subsidiaries, including Wild Well, from all claims of personal injury asserted by Max Welders employees pursuant to an April 20, 2004 Master Service Agreement ("MSA").[13]

Max Welders now seeks summary judgment with respect to Wilcox's claims under the Jones Act and the general maritime law.[14]  Max Welders argues that Wilcox is not a Jones Act seaman because he did not have the requisite connection to a vessel, or identifiable group of vessels, at the time of the alleged accident.[15]  Max Welders contends that Wilcox was a land-based welder who had worked for 34 different Max Welders customers, in connection with 191 Max Welders jobs, in its yard, in inland waters, and offshore.[16]

Wilcox responds that he meets the test for Jones Act seaman status because he was permanently reassigned to be a member of the crew of the SUPERIOR PERFORMANCE for this particular assignment.[17]  Wilcox further argues that the totality of the time he spent working offshore during the course of his employment with Max Welders qualifies him as a seaman.[18]

---

[12] R. Doc. No. 3.

[13] R. Doc. No. 9.

[14] R. Doc. No. 55.

[15] *See id.*

[16] *See id.*

[17] R. Doc. No. 66.

[18] *See id.*

Max Welders separately moved for summary judgment to dismiss the cross-claim filed jointly by Superior and Wild Well.[19]  Max Welders contends that the MSA identified by Superior and Wild Well in their cross-claim does not apply to the demolition work performed in this case for Wild Well on a platform owned by a third party.[20]  Max Welders argues, alternatively, that any indemnity provisions in the MSA are void and unenforceable as a matter of public policy under the Louisiana Oilfield Indemnity Act ("LOAIA"), La. Rev. Stat. Ann. § 9:2780.[21]

Superior and Wild Well oppose the motion for summary judgment and they have filed a cross-motion for summary judgment on the indemnity issues.[22]  Superior and Wild Well argue that the MSA covers the welding work performed by plaintiff and, alternatively, a September 9, 2010 Vessel Boarding, Utilization, and Hold Harmless Agreement ("VBA") provides Superior and Wild Well indemnity for the incident.[23]

## Standard of Law

Summary judgment is proper when, after reviewing the pleadings, the discovery and disclosure materials on file, and any affidavits, the court determines there is no genuine issue of material fact.  *See* Fed. R. Civ. P. 56.  The party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The party seeking summary judgment need

---

[19] R. Doc. No. 56.

[20] *See id.*

[21] *See id.*

[22] *See* R. Doc. Nos.  57.

[23] *See* R. Doc. Nos. 64, 82, 116.

not produce evidence negating the existence of material fact, but need only point out the absence of evidence supporting the other party's case.  *Id.*; *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1195 (5th Cir. 1986).

Once the party seeking summary judgment carries its burden pursuant to Rule 56, the other party must come forward with specific facts showing that there is a genuine issue of material fact for trial.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The showing of a genuine issue is not satisfied by creating "'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations omitted).  Instead, a genuine issue of material fact exists when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The party responding to the motion for summary judgment may not rest upon the pleadings, but must identify specific facts that establish a genuine issue.  *Id.*  The nonmoving party's evidence, however, "is to be believed, and all justifiable inferences are to be drawn in [the nonmoving party's] favor." *Id.* at 255; *see Hunt v. Cromartie*, 526 U.S. 541, 552 (1999).

## Discussion

### I.  Seaman Status

The United States Supreme Court has defined the essential requirements for seaman status as twofold.  First, "an employee's duties must 'contribut[e] to the function of the vessel or to the accomplishment of its mission.'" *Chandris, Inc. v. Latsis*, 515 U.S. 347, 368 (1995) (quoting *McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 355 (1991)).  Second, "a seaman must have a connection to a vessel in navigation (or to an identifiable group of such vessels) that is

5

substantial in terms of both its duration and its nature." *Id.*  Qualifying as a seaman under the Jones Act hinges on an employee's status in relation to a vessel rather than on the nature or location of the injury. *See id.* at 358-64. "Land-based maritime workers do not become seamen because they happen to be working on board a vessel when they are injured, and seamen do not lose Jones Act protection when the course of their service to a vessel takes them ashore." *Id.* at 361.

The inquiry into seaman status is a mixed question of law and fact and, therefore, "it often will be inappropriate to take the question from the jury." *Harbor Tug & Barge Co. v. Papai*, 520 U.S. 548, 554 (1997).  Summary judgment is appropriate where "the facts and the law will reasonably support only one conclusion." *Id.* (citing *Wilander*, 498 U.S. at 356). However, "'[i]f reasonable persons, applying the proper legal standard, could differ as to whether the employee was a 'member of a crew,' it is a question for the jury.'" *Chandris*, 515 U.S. at 369 (quoting *Wilander*, 498 U.S. at 356).

### A.  Contribution to Vessel's Function or Mission

Max Welders argues that Wilcox cannot show that his duties as a platform worker contributed to the function or mission of the SUPERIOR PERFORMANCE.  Max Welders argues that the purpose of the SUPERIOR PERFORMANCE was only to house workers and that Wilcox "merely slept, ate, relaxed, and occasionally performed sporadic fabrication and maintenance on the SUPERIOR PERFORMANCE."  Wilcox responds that he performed several tasks to further the mission of the vessel and that the vessel's mission included the demolition work that he performed on the platform.

The Fifth Circuit has recognized that performing "minor duties" on board a vessel that merely houses platform workers does not "transform [one's] position as a platform worker into

6

that of a seaman." *Hufnagel v. Omega Serv. Indus., Inc.*, 182 F.3d 340, 347 (5th Cir. 1999); *see also Brown v. Performance Energy Servs., LLC*, No. 08-852, 2009 WL 152505, at *4 (E.D. La. Jan. 20, 2009) (Africk, J.); *Falcon Operators, Inc. v. P.M.P. Wireline Servs., Inc.*, No. 97-825, 1997 WL 610825, at *3 (E.D. La. Sept. 30, 1997) (Clement, J.).   However, it is generally recognized that "satisfying the first prong of the test is relatively easy: the claimant need only show that he 'do[es] the ship's work.'" *Becker v. Tidewater, Inc.*, 335 F.3d 376, 387-88 (5th Cir. 2003) (quoting *Chandris*, 515 U.S. at 368).   An employee need not show that his duties "aid in navigation or contribute to the transportation of the vessel" to qualify as a seaman.   *Wilander*, 498 U.S. at 355.   Moreover, a worker's duties on a fixed platform may contribute to the mission of a vessel that functions as a workboat rather than merely as a space to house workers. *See Wilander v. McDermott Int'l., Inc.*, 887 F.2d 88, 90 (5th Cir. 1989) (holding that sandblasting and painting a fixed platform contributed to the function of a vessel that "functioned as a paint boat") *aff'd*  498 U.S. 337 (1991); *see also Johnson v. Tetra Applied Techs., L.L.C.,* No. 11-1992, 2012 WL 3253184, at *3 & n.20 (E.D. La. Aug. 7, 2012) (Africk, J.) (noting that the function of liftboats assisting plug and abandon operations was "not limited to storing equipment and housing personnel"); *Butcher v. Superior Offshore Int'l, LLC*, No. 07-8136, 2008 WL 5110629, at *2 (E.D. La. Dec. 2, 2008) (Vance, J.) ("[I]f the MAGGIE is a 'paint boat,' then plaintiff's duties—which consisted primarily of blasting and painting offshore platforms— clearly contributed to its mission.").

The Court finds that there are genuine issues of material fact with respect to whether Wilcox contributed to the function or mission of the SUPERIOR PERFORMANCE.  Although Max Welders argues that Wilcox merely slept and relaxed on the SUPERIOR PERFORMANCE, the extent to which Wilcox actually worked on the vessel is reasonably in dispute.   Wilcox

testified that he made repairs on the vessel, changed out water lines on the vessel, patched up "cooling stuff" for the air conditioners, helped crew members on and off the vessel onto the crew boat, assisted with bags, helped with the man basket, assisted with the offloading of supplies, performed general vessel housekeeping such as cleaning decks, and assisted various vessel operations such as tying ropes.[24]   Wild Well's daily vessel reports show that Wilcox also performed more substantial work on the vessel, including fabricating and welding various appurtenances of the vessel such as acetylene bottle racks, and fastening materials for safe transport on the material barge that was connected to the SUPERIOR PERFORMANCE.[25]

Moreover, a reasonable jury could find that the SUPERIOR PERFORMANCE had a function or mission beyond merely housing platform workers.   The work on the platform entailed a coordinated effort between the platform workers, the SUPERIOR PERFORMANCE, the M/V PACESETTER, and the material barge.[26]   The SUPERIOR PERFORMANCE was equipped with an 880-ton derrick crane that was used to lift materials from the sea floor and place them on the material barge where they could be sea fastened to the material barge by the welders.[27]   The SUPERIOR PERFORMANCE also had a small crawler crane used for lifting buoys, tools, and men.[28]   In light of this evidence, a reasonable jury could conclude that Wilcox did more than just "sleep [and] relax" on a vessel that merely housed platform workers.   *See Wilander*, 887 F.2d 88 at 90; *Johnson v. Tetra Applied Technologies*, 2012 WL 3253184, at *3 &

---

[24] Wilcox Dep., R. Doc. No. 66-6, at pp. 11-15

[25] Daily Vessel Reports, R. Doc. No. 66-4.

[26] *See, e.g.*, R. Doc. No.  164, at pp. 7-8.

[27] DeWolfe Dep., R. Doc. No. 57-3, at p. 13; Wilcox Dep., R. Doc. No. 55-4, at p. 2.

[28] DeWolfe Dep., R. Doc. No. 57-3, at p. 13.

n.20; *Butcher v. Superior Offshore*, 2008 WL 5110629, at *2.  Accordingly, genuine issues of material fact preclude summary judgment with respect to whether Wilcox contributed to the function of a vessel.

### B. Substantial Connection

The Supreme Court has provided the following explanation regarding the substantial connection requirement:

> The fundamental purpose of th[e] substantial connection requirement is to give full effect to the remedial scheme created by Congress and to separate the sea-based maritime employees who are entitled to Jones Act protection from those land-based workers who have only a transitory or sporadic connection with a vessel in navigation, and therefore whose employment does not regularly expose them to the perils of the sea.

*Papai*, 520 U.S. at 555 (quoting *Chandris*, 515 U.S. at 368).

The Supreme Court and the Fifth Circuit have held that an injured worker must show a connection to a vessel that is "substantial in terms of both duration (the temporal prong) and nature (the functional prong)."[29] *Roberts v. Cardinal Servs., Inc.*, 266 F.3d 368, 374 (5th Cir. 2001) (citing *Chandris*, 515 U.S. at 371).  "While seaman status is not simply a temporal concept, the amount of time a worker spends aboard a vessel in navigation is helpful in determining if that worker has attained seaman status." *Becker v. Tidewater, Inc.*, 335 F.3d 376, 388 (5th Cir. 2003).  As a general rule of thumb, in order to qualify as a Jones Act seaman, an employee should demonstrate that at least thirty percent of his work is spent in the service of a

---

[29] "[T]he *Chandris* Court emphasized that the test is conjunctive, stating that 'we think it is important that a seaman's connection to a vessel in fact be substantial *in both respects*." *Roberts*, 266 F.3d at 374 (emphasis in original) (quoting *Chandris*, 515 U.S. at 371).  Because an analysis of the temporal prong is dispositive in this case, the Court need not consider the functional prong.

vessel (or an identifiable group of vessels) in navigation.[30]  *Roberts*, 266 F.3d at 375.  "In deciding whether there is an identifiable group of vessels of relevance for a Jones Act seaman-status determination, the question is whether the vessels are subject to common ownership or control."[31] *Id.* at 376 (citing *Papai*, 520 U.S. at 556-57) (emphasis omitted).

Where, as here, "the employee's regularly assigned duties require him to divide his time between vessel and land (or platform), his status is to be determined in the context of his entire employment with his current employer." *Lormand v. Superior Oil Co.*, 845 F.2d 536, 540 (5th Cir. 1987) (citing *Barrett v. Chevron*, *U.S.A., Inc.*, 781 F.2d 1067, 1075 (5th Cir. 1986)). "[T]his rule applies unless the employee's permanent job assignment has changed during the course of employment by his present employer." *Lormand*, 845 F.2d at 540. "[A] worker who, over the course of his employment, has worked in the service of a vessel in navigation well under thirty percent of his time may still qualify for seaman status if he has been reassigned to a new position that meets this temporal requirement." *Becker*, 335 F.3d at 389. However, "[o]nly in this latter situation is the employee entitled to have the substantiality of his vessel-related work

---

[30] The Supreme Court approved of this benchmark, but clarified it as "no more than a guideline established by years of experience, and departure from it will certainly be justified in appropriate cases.  As we have said, '[t]he inquiry into seaman status is fact specific: it will depend on the nature of the vessel and the employee's precise relation to it.'" *Chandris*, 515 U.S. at 371 (quoting *Wilander*, 498 U.S. at 356).

[31] In *Roberts*, the Fifth Circuit stated that "[w]hen a group of vessels is at issue, a worker who aspires to seaman status must show that at least 30 percent of his time was spent on vessels, every one of which was under his defendant-employer's common ownership or control."  266 F.3d at 377. While *Roberts* addressed the thirty percent threshold in the context of a group of vessels owned by the plaintiffs' employer, cases from this district have clarified that *Roberts* did not overrule "long-standing Fifth Circuit jurisprudence that the employer need not be the owner or operator of the group of vessels at issue," and that that the vessels constituting the thirty percent must only be owned by a common entity. *Jenkins v. Aries Marine Corp.*, 554 F. Supp. 2d 635, 641 (E.D. La. 2008) (citing *Coats v. Penrod Drilling Corp.,* 5 F.3d 877 (5th Cir.1993)); *Alex v. Wild Well Control, Inc.,* No. 07-9183, 2009 WL 1507359, at *5 (E.D. La. May 28, 2003) (Fallon, J.).

assessed on the basis of a time period other than his entire term of employment by that employer." *Lormand*, 845 F.2d at 540.

It is clear that Wilcox cannot demonstrate a substantial connection to a vessel or any identifiable group of vessels under common ownership or control when considering his entire employment with Max Welders.  According to the declaration of Keith LeBlanc ("LeBlanc"), the operations manager for Max Welders, Wilcox has been employed as a welder with Max Welders since February 16, 2009.[32]  As a welder, Wilcox worked at Max Welders' fabrication yard in Gibson, Louisiana, located adjacent to Bayou Black, where various rigs, jackup rigs, barges, liftboats, and vessels would be brought by customers for fabrication/repair work.[33]  Wilcox also worked at other locations onshore and offshore performing identical work in furtherance of Max Welders' welding business.[34]  A comprehensive timecard report shows that Wilcox worked a total of 11,338 hours for Max Welders and 34 different customers on 191 jobs in the yard, in inland waters, and offshore.[35]  During this time, he performed welding services on various vessels, jackup rigs, liftboats, and/or barges including the barge MARMAC 15, the construction vessel INTERNATIONAL FRONTIER, the pipelaying vessel IOS PIPELINER, the SUPERIOR PERFORMANCE, the jackup rigs 204, 150, 170, the liftboats STARFISH, SEABASS, STINGRAY, ALBACORE, and MORAY, the derrick barge IOS800, BLACKWATER II, and Barge GOMC141, which were owned by various third parties such as International Construction,

---

[32] LeBlanc Decl., R. Doc. No. 55-2, at ¶¶7-8.

[33] *Id.* at ¶ 9.

[34] *Id.*

[35] *Id.* at ¶¶ 19-49; Timecard Report, R. Doc. No. 55-2, at pp. 22-64.

Hercules Offshore, Superior Energy, Blackwater, McDonough Marine Service, Cashman, Gulf Oceanic Marine Contractors, Inc., and others.[36]

Wilcox has come forward with no evidence demonstrating that at least thirty percent of his work was spent in the service of a vessel or an identifiable group of vessels under common ownership or control over the course of his entire employment with Max Welders.   The Fifth Circuit and the U.S. District Court for the Eastern District of Louisiana have held under analogous circumstances and in numerous cases that itinerant or transitory workers do not qualify for seaman status when they lack the requisite temporal connection to a vessel or fleet of vessels under common ownership or control.  *See, e.g.*, *St. Romaine v. Indus. Fabrication & Repair Serv.*, 203 F.3d 376, 379-80 (5th Cir. 2000); *Hufnagel*, 182 F.3d at 347-48; *Langston v. Schlumberger Offshore Serv., Inc.*, 809 F.2d 1192 (5th Cir. 1987); *Ardleigh v. Schlumberger Ltd.*, 832 F.2d 933, 934 (5th Cir. 1987).[37]

Wilcox nevertheless argues that the substantiality of his vessel-related work should be assessed on the basis of the time he spent performing decommissioning work offshore for Wild Well because he was permanently reassigned to work on a vessel every time he performed welding services offshore.[38]  In *Becker*, the Fifth Circuit expressly rejected this precise argument when it explained:

---

[36] LeBlanc Decl., R. Doc. No. 55-2, at ¶¶ 48, 51; Timecard Report, R. Doc. No. 55-2, at pp. 22-64.

[37]  The Court notes that Wilcox clearly does not fall within the *Bertrand* exception, which has been limited to the facts of that case.  *See Willis v. Gugro Chance, Inc.*, 278 F. App'x 443, 447 (5th Cir. 2008) (citing *Buras v. Commercial Testing & Eng'g Co.*, 736 F.2d 307, 311 (5th Cir. 1984)); *see also Roberts v. Cardinal Servs., Inc.*, 266 F.3d 368, 376-77 (5th Cir. 2001); *St. Romain v. Indus. Fabrication & Repair Svc., Inc.*, 203 F.3d 376, 379-80 (5th Cir. 2000) (stating that because the worker "did not work aboard vessels under common ownership or control," he "[wa]s not a seaman").

[38] *See* R. Doc. No. 66, at p. 18.

a worker whose duties sometimes take him to sea could claim that the start of each voyage establishes a reassignment to a sea-based position and that his return to shore again shifts his status back to a land-based worker. It appears that the Supreme Court attempted to preempt such arguments by specifically rejecting a "voyage test" of seaman status under which a worker could "walk into and out of coverage in the course of his regular duties." *Id.* at 363, 115 S. Ct. 2172 (citing *Barrett v. Chevron, U.S.A., Inc.*, 781 F.2d 1067, 1075 (5th Cir. 1986)). Rather, the Court's opinion in *Chandris* contemplates that a change in coverage under the Jones Act occurs only when the status of the worker changes, not simply because a worker happens to serve on a vessel before returning to work on land. *See Chandris*, 515 U.S. at 363, 115 S.Ct. 2172. Thus, for plaintiff to qualify for the Jones Act's protections, he must have undergone a substantial change in status, not simply serve on a boat sporadically. To give teeth to the *Chandris* opinion's rejection of a voyage test, it must be held that merely serving an assignment on a vessel in navigation does not alter a worker's status. If that were not the case, *Chandris* in fact would have established a voyage test. This conclusion is consistent with the language of *Chandris*, which instructs that "we do not believe that any maritime worker on a ship at sea as part of his employment is automatically a member of the crew within the meaning of the statutory scheme." *Id.* at 358, 115 S. Ct. 2172.

335 F.3d at 389-90.

The Fifth Circuit has made clear that a plaintiff is entitled to have the substantiality of his vessel-related work assessed on the basis of a new work assignment only if he received "a new work assignment before his accident in which either his essential duties or his work location is permanently changed." *Barrett*, 781 F.2d at 1075-76. This exception cannot be established through testimony that a temporary offshore worker was merely given training in offshore work and safety, that he was treated as part of the crew, or that he was ordered to work a crew position. *See Becker*, 335 F.3d at 390-91. An otherwise land-based worker must show that his "essential duties" had "substantial[ly]" or "fundamentally" changed, not merely that he "serve[d] on a boat sporadically." *Id.* at 388-91.

13

Wilcox has not shown that his essential duties changed when he was assigned to perform welding services in connection with the Wild Well project.  According to LeBlanc, this project was not a permanent change in Wilcox's employment, but merely another Max Welders job in which plaintiff's primary duties as a contract welder were to assist the platform fabrication and/or demolition work.[39]  The bid package for the project shows that the decommissioning work "was projected to last approximately two months,"[40] and Brandon DeWolfe ("DeWolfe"), marine operations manager for Wild Well, testified that the variable nature of Wild Well's work required the use of temporary third-party contract welders based only on the specific welding requirements for the job.[41]  Although Wilcox claims that he was treated as part of the crew for the voyage and that he performed minor tasks on the vessels "whenever [he] had downtime," Wilcox, himself, recognized in his deposition that he spent most of his time performing welding services on the platform, and that his "primary job" was welding and fitting on the platform.[42]

The Fifth Circuit has rejected claims of seaman status as a matter of law in numerous cases in which temporary offshore workers—including contract welders such as Wilcox—claimed that they were permanently reassigned for a discrete voyage in which their essential duties did not change.  *See, e.g.*, *Becker*, 335 F.3d at 390-93; *Lormand,* 845 F.2d at 541; *Barrett*, 781 F.2d at 1076; *Longmire v. Sea Drilling Corp.*, 610 F.2d 1342 (5th Cir. 1980); *see also Ausama v. Tetra Applied Technologies, LP*, No. 05-2513, 2006 WL 1968858 (E.D. La. June 1, 2006) (Lemelle, J.).  The facts of this case are materially indistinguishable from those in which

---

[39] LeBlanc Decl., R. Doc. No. 55-2, at ¶¶ 56, 60.

[40] ERT Request for Quotation, R. Doc. No. 66-2, at ¶ 2.8.

[41] Dewolfe Dep., R. Doc. No. 80-1, at pp. 12-14.

[42] Wilcox Dep., R. Doc. No. 55-4, at pp. 2-3.

the Fifth Circuit previously held that a temporary offshore worker was not permanently reassigned to a vessel.  Wilcox has failed to show that a genuine issue of material fact exists with respect to whether he was permanently reassigned to the SUPERIOR PERFORMANCE.

In summary, Wilcox has not shown that he qualifies as a Jones Act seaman.  Even if his work furthered the function or mission of the SUPERIOR PERFORMANCE, he lacks the requisite connection to a vessel in navigation or to an identifiable group vessels under common ownership or control because he cannot show that he spent at least thirty percent of his time with Max Welders in the service of such vessels. Nor can he show that he was permanently reassigned to the SUPERIOR PERFORMANCE in connection with this particular project.  Accordingly, Max Welders' motion for summary judgment must be **GRANTED** and plaintiffs' claims under the Jones Act and the general maritime law must be **DISMISSED WITH PREJUDICE**.

## II.  Indemnity

### A.  The Master Service Agreement

As previously stated, Superior and Wild Well alleged in their cross-claim that Max Welders owes them insurance and indemnity obligations pursuant to an April 2004 Master Service Agreement ("MSA").  Max Welders has moved for summary judgment with respect to the cross-claim on the ground that the MSA does not apply to the work performed in this case. Max Welders argues, alternatively, that the indemnity provisions are void and unenforceable as a matter of public policy under the Louisiana Oilfield Indemnity Act ("LOAIA"), La. Rev. Stat. Ann. § 9:2780.  Because the Court agrees with Max Welders that the insurance and indemnity obligations in the MSA would be unenforceable pursuant to the LOAIA, the Court need not consider whether the terms and conditions of the MSA encompassed this particular work order.

The Louisiana legislature enacted the LOAIA to correct "an inequity . . . foisted on certain contractors . . . by the defense or indemnity provisions . . . contained in some agreements pertaining to wells for oil, gas, or water, or drilling for minerals . . . ."[43] La. Rev. Stat. Ann. § 9.2780(A). The LOAIA makes "void and unenforceable" any "provision contained in, collateral to, or affecting an agreement pertaining to a well for oil, gas, or water . . . to the extent that it purports to or does provide for defense or indemnity" or requires "additional named insured endorsements." *Id.* § 9:2780(B), (G).  The LOAIA defines the term "agreement" as

> any agreement . . . concerning any operations related to the exploration, development, production, or transportation of oil, gas, or water . . . or an agreement to perform any portion of any such work or services or any act collateral thereto, including the furnishing or rental of equipment, incidental transportation, and other goods and services furnished in connection with any such service or operation.

La. Rev. Stat. Ann. § 9:2780(C).  The "operations" contemplated by the LOAIA include "but [are] not limited to . . . plugging, or otherwise rendering services in or in connection with any well drilled for the purpose of producing . . . or other structure intended for use in the exploration for or production of any mineral . . . ." *Id.*; *see also Howell  v. Avante Servs., LLC*, No. 12-293, 2013 WL 1681436, at *3-4 (E.D. La. Apr. 17, 2013) (Vance, J.).

"The Fifth Circuit has synthesized these provisions into a two-part test: '[I]f (but only if) the agreement (1) pertains to a well and (2) is related to exploration, development, production, or transportation of oil, gas, or water, will the Act invalidate any indemnity provision contained in or collateral to that agreement.'" *Howell*, 2013 WL 1681436, at *4 (quoting *Transcon. Gas Pipe Line Corp. v. Transp. Ins. Co.*, 953 F.2d 985, 991 (5th Cir. 1992).

---

[43] Superior and Wild Well conceded in their motion for summary judgment, and this Court agrees, that Louisiana law governs the MSA. *See* R. Doc. No. 57-1, at pp. 5-9. *See Union Tex. Petroleum Corp. v. PLT Eng'g, Inc.*, 895 F.2d 1043, 1047 (5th Cir. 1990); *Davis & Sons, Inc. v. Gulf Oil Corp.*, 919 F.2d 313, 316 (5th Cir. 1990).

"The inquiry into whether an agreement pertains to a well is 'a fact intensive case by case analysis.'" *Teaver v. Seatrax of La., Inc.*, No. 10-1523, 2012 WL 5866042, at *4 (E.D. La. Nov. 19, 2012) (Barbier, J.) (quoting *Verdine v. Ensco Offshore Co.*, 255 F.3d 246, 251-52 (5th Cir. 2001)); *see also Transcon.*, 953 F.2d at 994-95. The Fifth Circuit has provided a nonexclusive list of factors to consider when determining whether an agreement pertains to a well. *See Transcon.*, 953 F.2d at 994-95. When, as here, the agreement does not concern transportation of oil or gas, some of the relevant factors include the following:

> (1) whether the structures or facilities to which the contract applies or with which it is associated are part of an in-field production system; (2) what is the geographical location of the structure or facility relative to a well or wells; (3) what is the purpose or function of the facility or structure in question; (4) who owns and operates the relevant facility or structure; (5) and "any number of other details affecting the functional and geographic nexus between 'a well' and the structure or facility that is the object of the agreement . . . ."

*Howell*, 2013 WL 1681436, at *5 (quoting *Broussard v. Conoco*, Inc., 959 F.2d 43, 45 (5th Cir. 1992)).

In *Howell v. Avante Services, LLC*, No. 12-293, 2013 WL 1681436, at *4 (E.D. La. Apr. 17, 2013) (Vance, J.), another section of this Court held that an agreement "to cut and pull casings from . . . wellbore," as part of a broader decommissioning plan, fell within "[a] straightforward reading of the plain language of the LOAIA" and the Fifth Circuit's framework for evaluating the coverage of the LOAIA. The court began its analysis by noting that the agreement fell within the plain language of the statute as it required the performance of an act that was "collateral to plugging the well." *See id.* (citing La. Rev. Stat. Ann § 9:2780(C)).

The court then analyzed the relevant *Transcontinental* factors and found support for its finding that the agreement pertained to a well. *id.* at *5. The court explained that the platform and casings were owned by an exploration and production company, the casings were part of the

well production system, the purpose of the casings was to assist in gas and oil production, the casing pipe had a geographic nexus to the wells because the casing pipe was in the wellbore, and there was a functional nexus between the casings and the well because the casings were part of the wellbore.  *Id.*  The court similarly held that the agreement was related to the exploration, development, production or transportation of oil because "cutting and pulling the casing was at least collateral to the plugging process." *Id.* at *7.  The court explained that "cutting and pulling the casings can [not] be logically severed from the overall plug and abandonment operation," otherwise "LOAIA would cease to apply at some arbitrary point in carrying out the plan. Neither the statute nor the Fifth Circuit's test anticipated such an odd result." *Id.* at *8.

The court's analysis in *Howell* is equally applicable to the facts of this case which are virtually indistinguishable.  As stated by DeWolfe, the agreement in this case called upon Max Welders to provide welding services in connection with the removal of:

> 16 or so different platforms, including a multitude of these extremely large caissons and the – that was – one of the groups that we were awarded was a group of very large caissons . . . . Basically, what it is is it's a . . . jacket structure . . . a large pipe, a single – single pipe.  It typically varies in diameter from – from mud line to, you know, up to surface, but, you know – then on top of it is just a small boat landing and a little mini deck. . . . that's the jacket structure.  That's the – the physical structure that – that protects, you know, the – the well conductor.[44]

As in *Howell*, the agreement to provide welding services in connection with the decommissioning of oil and gas platforms and the removal of the "very large caissons" that housed the well conductors falls within "a straightforward reading of the plain language of the LOAIA" because it is an agreement to perform an act that is "collateral to plugging the well." *See Howell*, 2013 WL 1681436, at *4 (citing La. Rev. Stat. Ann. § 9:2780(C)).  As in *Howell*,

---

[44] DeWolfe Dep., R. Doc. No. 57-3, at pp. 8-9.

the platforms and caissons were owned by an exploration and production company, the platforms and caissons were part of the well production system, the purpose of the platforms and caissons was to assist in oil and gas production, the platforms and caissons clearly had a geographic nexus to the well, and there was a functional nexus between the platforms, caissons, and the well because they provided the physical structure that housed and protected the well conductor.  *See id.* at \*5.  Additionally, the agreement was "related to exploration, development, production, or transportation of oil, gas, or water" because removing the platforms and caissons were "at least collateral to the plugging process." *See id.* at \*7-8.

Superior and Wild Well nevertheless argue that the agreement to provide welding services in this case does not "pertain to a well" because "the decommissioning operation took place on a structure housing a well that had already been plugged and abandoned and was in the process of being fully decommissioned."[45]  Superior and Wild Well note that the ERT Request for Quotation provides that the wells were to be plugged and abandoned, the platform equipment was to be cleaned and purged, and the pipelines were to be plugged, severed, and the ends buried prior to the requested decommissioning work. Superior and Wild Well contend that "[w]here there is no functional or geographic nexus between a live well and the structure in question, the LOAIA does not apply."[46]

As the court noted in *Howell*, however, "[t]his argument . . . is foreclosed by the Fifth Circuit's decision in *Verdine*."  *Id.* at \*5.  In *Verdine*, a platform owner hired a contractor to refurbish a platform that was not participating in the exploration, production, or transportation of

---

[45] R. Doc. No. 57-1, at p. 11.

[46] *Id.*

oil or gas. *Verdine*, F.3d at 254. The Fifth Circuit rejected the argument that the parties' agreement did not "pertain to a well," explaining,

> The Louisiana legislature clearly envisioned the Act's application to agreements for services on structures that were not developing, producing or transporting oil or gas or geographically connected to a specific well. We do not interpret the legislature's requirement that an agreement pertain to a well in such a restrictive manner that we overlook agreements to which the Act was intended to apply. The Act encompasses agreements for services on structures intended for the use in the oil and gas industry, so long as the agreement pertains to a well or wells.

*Id.* at 253. While the platform was decommissioned at the time of the contract performance, it was nevertheless "designated for use on particular wells" and "intended for use in the exploration of oil and gas production." *Id.* at 254. Accordingly, the Fifth Circuit held that the LOAIA applied to the agreement and it invalidated the indemnity provision. *Id.*

In *Howell*, the court held that the decision in *Verdine* foreclosed the argument that a structure is no longer "intended" for use in the exploration and production of oil and gas if it is no longer involved in or capable of hydrocarbon production. *See Howell*, 2013 WL 1681436, at *5-6. The court explained that "the LOAIA covers agreements concerning 'plugging' and acts 'collateral' to plugging," and that such an interpretation would exclude activities which the LOAIA expressly covers. *See id.* at *6. Following *Verdine*, the court noted that it would "not interpret the requirement that an agreement pertain to a well to exclude agreements to which the Act was intended to apply." *See id.* As a result, the court explained that the phrase "intended for use in the exploration or production of any mineral 'refers to the general purpose of the structure, not its use at the precise moment in time the work was performed.'" *See id.* The court concluded:

> the context of the agreement to cut and pull casings within the overall scheme to plug and abandon the well demonstrates that it is

> an agreement collateral to plugging the well. The agreement falls within the plain terms of La. Rev. Stat. Ann. § 9:2780(C), and the *Transcontinental* test is satisfied.

*Id.* at *8.

This Court finds the reasoning in *Howell* persuasive and it declines to adopt the narrow reading asserted by Superior and Wild Well.  Accordingly, the Court agrees with Max Welders that even if the MSA applied in this case, the obligations to defend, indemnify, or comply with the additional named insured provisions are void and unenforceable under the LOAIA.

**B.  The Vessel Boarding Agreement**

Superior and Wild Well argue, in the alternative, that they are entitled to indemnity pursuant to the September 9, 2010 Vessel Boarding, Utilization, and Hold Harmless Agreement ("VBA").  The VBA provides, in part, as follows:

> This VESSEL BOARDING, UTILIZATION, AND HOLD HARMLESS AGREEMENT (the "Agreement") dated as of Sept. 9, 2010, [] between SUPERIOR ENERGY SERVICES, L.L.C., ("Owner") and Max Welders ("Contractor") is being executed by Contractor for the purpose of obtaining access from Owner to vessels owned, chartered, and/or operated by Owner, to provide employees of Contractor with working, living or operating support aboard the vessels of Owner, and in order to allocate the risks and liabilities arising out of Owner granting to Contractor such access to and services of its vessels.

> Contractor agrees to defend, indemnify and hold Owner harmless from and against any claims, losses, or demands of any kind arising as a result of personal injury, death or disease, that may be asserted by Contractor or any sub-contractor of Contractor, or on behalf of any of its or their employees, agents or invitees, no matter how occasioned, and even though such claims may be caused or brought about by the sole, joint or concurrent fault or negligence of Owner or its employees, or by any strict liability assigned to Owner by the appropriate law or by the

21

unseaworthiness of any vessel owned, operated and/or chartered by Owner.[47]

It is clear that the plain language of this contract unambiguously provides indemnity in connection with vessels "owned, charted, and/or operated" by Superior—not vessels "owned, charted, and/or operated" by Wild Well. Although Superior previously owned the SUPERIOR PERFORMANCE, the vessel was transferred to Wild Well in October 2011, months before this accident, when Superior's marine division was dissolved and sold to another entity.[48]  It is undisputed that Wild Well—not Superior—was the owner of the SUPERIOR PERFORMANCE at the time of the accident.[49]

Superior and Wild Well contend that the VBA was intended to be an addendum to the MSA providing indemnity in connection with vessels owned by Superior and its "Company Group," as that term is defined in the MSA.  Under federal maritime law, however, "a court may not look beyond the written language of the document to determine the intent of the parties unless the disputed contract provision is ambiguous." *Curtis Callais Welding, Inc. v. Stolt Comex Seaway Holdings, Inc.*, 129 F. App'x. 45, 54 (5th Cir. 2005) (unpublished) (quoting *Corbitt v. Diamond M. Drilling Co.*, 654 F.2d 329, 332-33 (5th Cir. 1981)).

As Max Welders notes, the VBA does not provide that it should be interpreted as an addendum to the MSA, make any reference to the MSA, or otherwise incorporate any defined terms in the MSA.  It noticeably does not incorporate any definition of "Company Group," as it

---

[47] VBA, R. Doc. No. 64-8, at p. 1. The Court notes that the VBA is clearly a maritime contract and that it is not subject to Louisiana law.  *See Johnson v. Seacor Marine Corp.* 404 F.3d 871, 877 (5th Cir. 2005).

[48] *See* DeWolfe Decl., R. Doc. No. 116-2, at ¶¶ 3, 5.

[49] The Court notes that Superior and Wild Well do not argue that the VBA provides indemnity in connection with any other vessels.

specifically defines "Owner" as Superior Energy Services, L.L.C. and "Contractor" as Max Welders.   Moreover, the plain language of the MSA states that it "embodies the entire understanding of the parties hereto and there are no further or other agreements or understandings, written or oral, that governs the Work provided hereunder."[50] As a result, nothing in either the MSA or the VBA suggests that the VBA was intended to cover any vessels owned by companies other Superior.

Superior and Wild Well concede that the plain language of the VBA unambiguously does not apply to vessels owned by Wild Well, but they contend that the terms of the VBA should be reformed to reflect the parties' alleged mutual intent.[51] "Reformation of . . . any contract, is an extraordinary remedy, and the courts exercise it with great caution." *Bischoff v. State Farm Fire & Cas. Co.*, No. 91-2075, 1992 WL 31344, at *1 (E.D. La. Feb. 10, 1992) (Clement, J.) (citing 43 Am. Jur. 2d, Insurance, § 357).   Reformation is warranted only "to embody the parties' mutual intent; otherwise, the courts would, in effect, be rewriting the contract." *Motors Ins. Co. v. Bud's Boat Rental, Inc.*, 917 F.2d 199, 203 (5th Cir. 1990).   "Parole evidence is admissible to establish such a mutual error, but not to create ambiguity in the meaning of an intended term." *Am. Elec. Power Co. v. Affiliated FM Ins. Co.*, 556 F.3d 282, 287 (5th Cir. 2009). "The party

---

[50] *See* MSA, R. Doc. No. 56-2, at ¶ 18.

[51] *See* R. Doc. No. 116, at p. 8.   Superior and Wild Well rely on Louisiana law in support of this argument.   Max Welders does not contend that a federal maritime law rule of decision regarding reformation is applicable.   *See* R. Doc. No. 120.   The Fifth Circuit applies Louisiana law regarding reformation of maritime contracts under such circumstances.   *See Motors Ins. Co. v. Bud's Boat Rental, Inc.*, 917 F.2d 199, 203 (5th Cir. 1990) ("The Fifth Circuit has previously applied Louisiana law to reform a maritime hull and indemnity policy. No party contends that a federal maritime rule of decision regarding policy reformation is applicable. We therefore proceed to apply state law.") (citing *Pacific Ins. Co. v. Quarles Drilling Corp.*, 850 F.2d 1087 (5th Cir.1988)).

seeking reformation has the burden to establish a mutual error in the creation of a contract." *Id.* & n.4.

Superior and Wild Well essentially argue that the VBA should be reformed to reflect a mutual intent to provide knock-for-knock indemnity in connection with vessels owned not just by Superior (i.e., "Owner"), but also in connection with any vessel owned by Superior's "Company Group," as that term is defined in the MSA.  More specifically, however, Superior and Wild Well argue that the parties simply "forgot to amend the Vessel Boarding Agreement to change the name of the owner to be indemnified from Superior Energy Services, LLC to Wild Well" when ownership of the SUPERIOR PERFORMANCE was transferred to Wild Well.[52]

In *American Electric Power Co. v Affiliated FM Insurance Co.*, 556 F.3d 282 (5th Cir. 2009), the Fifth Circuit rejected a similar attempt to introduce parol evidence to show that the term "corporation," as used in an insurance policy, was intended to include coverage for not only the company's subsidiary corporations, but also for the company's subsidiary limited liability companies.  The Fifth Circuit declined to consider extrinsic evidence showing that "the original parties had a broader-than-usual meaning in mind when they purposefully included the word." The Fifth Circuit also explained that considering the company's affidavits regarding the meaning of the term "corporation" would allow it to "make an end-run around the parol-evidence rule by framing it[] . . . as a request for reformation."  In this case, although Superior and Wild Well submitted affidavits in an attempt to argue that the VBA was intended to apply to vessels owned not by not only Superior, but also its "Company Group," the Court finds that, as in *American Electric Power*, this would essentially allow them to make an end-run around the parol evidence

---

[52] *See* Derise Decl. 116-4, at ¶ 12. As Max Welders notes, Superior and Wild Well have subtly misstated the substance of the VBA by suggesting that the VBA obligates Max Welders to indemnify the owner of the SUPERIOR PERFORMANCE.  In fact, the VBA obligates Max Welders to indemnify Superior in connection with the use of *vessels owned by Superior*.

rule by arguing that they had a broader-than-usual meaning in mind when they defined the term "Owner" in the VBA as "Superior Energy Services, L.LC."

More to the point, however, is the fact that Superior and Wild Well have come forward with no evidence showing that the VBA did not reflect the parties' mutual intent at the time the agreement was reduced to writing.  "A mutual mistake is a mistake shared by both parties to the instrument *at the time of reducing their agreement to writing,* and the mistake is mutual if the contract has been written in terms which violate the understanding of both parties." *Shreveport Plaza, LLC v. Dollar Tree Stores, Inc.*, 196 F. App'x 320, 322 (5th Cir. 2006) (emphasis in original) (quoting *Fireman's Fund Ins. Co. v. Bulliard Farm, Inc.*, 915 So. 2d 1014, 1017 (La. Ct. App. 3d Cir. 2005)).  "The evidence of mutuality must relate to the time of the execution of the instrument and show that the parties then intended to say one thing and by mistake expressed another and different thing." *Hall Ponderosa, LLC v. Petrohawk Props., L.P.*, 90 So. 3d 512 (La. Ct. App. 3d Cir. 2012) (quoting *WMC Mortgage Corp. v. Weatherly,* 963 So. 2d 413, 416 (La. Ct. App. 2007)).

In this case, Superior and Wild Well claim that they simply "forgot" to amend the VBA after Superior transferred ownership of the Superior Performance to Wild Well.  However, this clearly does not show that, at the time it was executed, the VBA failed to reflect the mutual intent of the parties.  Moreover, the Superior Performance was owned by Superior and Wild Well at the time the VBA was executed, so they cannot show there was any mutual mistake in failing to include vessels owned by Superior's "Company Group" within the terms of the VBA. Rather, any error in either failing to include Superior's "Company Group" within the terms of the VBA, or in simply "forgetting" to amend the VBA, amounts to unilateral error on the part of Superior and Wild Well, which is not a sufficient basis to reform the VBA in this case.

## Conclusion

Considering the foregoing,

**IT IS ORDERED** that Max Welders' motion for summary judgment as to plaintiffs' claims under the Jones Act and the general maritime law is **GRANTED**.   Plaintiffs' claims under the Jones Act and the general maritime law are **DISMISSED WITH PREJUDICE**

**IT IS FURTHER ORDERED** that Max Welders' motion for summary judgment against Superior and Wild Well is **GRANTED** and Superior and Wild Well's cross-motion for summary judgment is **DENIED**.

New Orleans, Louisiana, August 28, 2013.

**LANCE M. AFRICK**
**UNITED STATES DISTRICT JUDGE**

26